IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　Plaintiff,<br><br>vs.<br><br>JOSE ALFREDO ROMAN-RODRIGUEZ,<br><br>　　　　　　　　Defendant. | MEMORANDUM DECISION AND ORDER<br><br>Case No. 2:16CR295DAK<br><br>Judge Dale A. Kimball |

　　　　This matter is before the court on Defendant Jose Alfredo Roman-Rodriguez's Motion to Suppress statements he made during a custodial interrogation following his arrest on June 8, 2016.  The court held an evidentiary hearing on the motion to suppress on October 17, 2016, and closing arguments on December 14, 2016.  At the hearings, Defendant was present and represented by Walter F. Bugden, and Plaintiff was represented by Aaron B. Clark.  The court has carefully considered the evidence and testimony presented at the evidentiary hearing, the parties' memoranda, and the law and facts relating to this motion.  Now being fully advised, the court issues the following Memorandum Decision and Order.

FINDINGS OF FACT

　　　　Defendant is from Sinaloa, Mexico, and arrived in Utah on or about June 1, 2016. Defendant was staying with an acquaintance and intending to attend a school located in Salt Lake

City.  On June 8, 2016, agents served a federal search warrant at the residence where Defendant was staying based on an ongoing narcotics trafficking investigation.  Defendant was arrested during the service of the warrant at the residence.

After Defendant was arrested, the agents transported Defendant to the Salt Lake City District Office ("SLCDO") of the DEA.  At the SLCDO, agents Mark Bacon, Manuel Scott, and Tim Sorenson interviewed Defendant.  Defendant does not speak English so Scott, who was the only agent fluent in Spanish, conducted the interview and acted as a Spanish language interpreter.  Spanish was Scott's first language and he spoke it while he was growing up.  Scott testified that they did not have any problem understanding each other.

Prior to the recorded interview, Scott spoke to Defendant while he was taking him from the holding room to the interview room.  Scott testified that he told Defendant that there was a bathroom available and he could use it any time he needed it.  Defendant testified that Scott also told him that if he answered their questions, he would be able to go home in a week.  Scott denies making such a statement and testified that such a promise would have been improper.  Defendant acknowledged that neither he nor Scott ever mentioned this alleged promise during the entire recorded interview that followed.

The three agents were in the interview room with Defendant. The room was approximately eight feet by ten feet.  The agents did not handcuff Defendant, provided him with water, and kept their firearms out of sight.  There is no evidence that there were any threats or intimidation.  The agents were professional and courteous in their communications with Defendant.

After obtaining some basic background information from Defendant, Scott told Defendant he had a form he was going to ask him to sign. The interview proceeded as follows:

| | |
|---|---|
| Scott: | I have a form here that I am going to ask you to sign. |
| Defendant: | Uh huh. |
| Scott: | If you'd like. I don't know. Umm, they are warnings of rights. I am going to read it to you. (UN) |
| Bacon: | (UN) |
| Scott: | I am going to ask you if you understand. Yes or no. |
| Defendant: | If I understand? |
| Scott: | Uh huh. I am going to ask you some questions. They are the right warning. |
| Defendant: | Uh huh. |
| Scott: | Before you are asked any questions, you have to understand your rights. |
| Defendant: | Uh huh. |
| Scott: | You have the right to remain silent. |
| Defendant: | Yes. Yes. |
| Scott: | Anything you say can be used in court against you. |
| Defendant: | Uh huh. |
| Scott: | Before asking you any questions you have the right to talk to an attorney. |
| Defendant: | Uh huh. |
| Scott: | You have the right to have an attorney present during the interview. If you |

|            |                                                                                     |
|------------|-------------------------------------------------------------------------------------|
|            | are not able to pay for the services of an attorney and if you want, an attorney can be appointed before asking you any question. |
| Defendant: | Uh huh. |
| Scott:     | Have you understood your rights? Yes? Are you willing to answer some questions? |
| Defendant: | Yes. |
| Scott:     | Yes? So, I need you to put your initials here saying that you understand the questions. |
| Defendant: | Initials? How? |
| Scott:     | The first letter of you name and your last name. |
| Defendant: | Hmm. |
| Scott:     | So J.R. (UN) So, you waived your rights? |
| Defendant: | Excuse me? |
| Scott:     | You waive your rights? Would you like to talk to us? About what happened in the house in the morning. About what has been happening there. |
| Defendant: | Yes. Yes. |
| Scott:     | So, my rights have been read to me above and mentioned and I understand what my rights are. At this time, I am willing to freely and voluntary answer any question without having an attorney present. |
| Defendant: | How is this going to hurt me? |

| | |
|---|---|
| Scott: | If you are willing to talk to us, the information that you give us about this operation, about what was happening in the house . . . |
| Defendant: | Hmmm |
| Scott: | It can be used in your favor.  We give the information to the prosecutor. |
| Defendant: | Uh huh. |
| Scott: | Right?  When you go to Court . . . so that can be used to help you.  Are you willing to waive your rights and honestly and frankly talk to us?  Any time that you say: "you know what?  I don't want to ask any more," you can say "you know what? No more.  (UN) want."  It's at your complete discretion. |
| Defendant: | Uh huh. |
| Scott: | (UN) voluntarily that.  You can say "I don't want to say anything" at any time and (UN) questions.  Are you will to answer some questions? |
| Defendant: | Yes, I mean, what can I say in one week. |
| Scott: | (UN) on this one and your signature here.  I am signing that witness (UN) that you have signed the form. |

The form Defendant initialed was in Spanish.  Defendant initialed that "someone has read to me this advice of rights and I understand what my rights are.  I am willing to freely and voluntarily answer questions without a lawyer present."  During the interview, Defendant never indicated that he wanted to stop or have an attorney present.

**CONCLUSIONS OF LAW**

Defendant moves to suppress any statements he made during the June 8, 2016 interview on the grounds that he did not voluntarily or knowingly waive his *Miranda* rights. *Miranda v. Arizona*, 384 U.S. 436 (1966). *Miranda* requires that procedural safeguards be administered to "custodial interrogations." *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993). A *Miranda* warning must be given when the suspect is (1) in custody and (2) the questioning meets the legal definition of interrogation. *Id.* The parties agree that Defendant was in custody and the interview constituted an interrogation.

A *Miranda* waiver must be made "voluntarily, knowingly, and intelligently." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). The waiver inquiry has "two distinct dimensions":

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Id.* Factors relevant to the totality of the circumstances are the personal characteristics of the accused and the details of the interrogation, including: the suspect's age, intelligence, and education; whether the suspect was informed of his or her rights; the length and nature of the suspect's detention and interrogation; and the use or threat of physical force against the suspect. *Smith v. Mullin*, 379 F.3d 919, 932 (10th Cir. 2004).

The *Miranda* Court stated that "[n]o effective waiver . . . can be recognized unless

specifically made after the [*Miranda*] warnings . . . have been given." 384 U.S. at 470. "[A] valid waiver will not be presumed . . . simply from the fact that a confession was in fact eventually obtained." *Id.* at 475. "[A] heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self incrimination and his right to retained or appointed counsel." *Id*.

But "[t]he course of decisions since *Miranda*, informed by the application of *Miranda* warnings in the whole course of law enforcement, demonstrate that waivers can be established even absent formal or express statements of waiver that would be expected in, say, a judicial hearing to determine if a guilty plea has been properly entered." *Berghuis v. Thompkins*, 560 U.S. 370, 383 (2010). The Tenth Circuit has recognized that "[n]othing in *Miranda* requires an officer to ask specifically if the suspect waives his rights." *United States v. Varela*, 576 Fed. Appx. 771, 776 (10th Cir. 2014). And, the Supreme Court has explained that an implicit waiver can be made through "the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

Nonetheless, "[i]f the State establishes that a *Miranda* warning was given and the accused made an uncoerced statement, this showing, standing alone, is insufficient to demonstrate 'a valid waiver.'" *Berghuis*, 560 U.S. at 384. "The prosecution must make the additional showing that the accused understood these rights." *Id.* "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Id.*

"The [Supreme] Court's cases have recognized that a waiver of *Miranda* rights need only

meet the standard of *Johnson v. Zerbst*." The *Zerbst* Court explained: "It has been pointed out that 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights and that we 'do not presume acquiescence in the loss of fundamental rights.' A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). "The determination of whether there has been an intelligent waiver of right . . . must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Id.*

As already pointed out in the *Burbine* standard above, there must be a demonstration of a "requisite level of comprehension," which is a "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." 475 U.S. at 421. "Whether [defendant] understood his *Miranda* rights is a question of fact, which underlies the legal question of whether his waiver was knowing and intelligent." *Valdez v. Ward*, 219 F.3d 1222, 1231 (10th Cir. 2000).

In this case, the court questions whether Defendant understood his rights. He stated "yes" or "uh huh" after each right was read to him. However, when Scott asked Defendant if he understood his rights, Scott coupled the question with the question of whether Defendant was willing to answer some questions. Because of the compound question, Defendant did not clearly state that he understood his rights. In addition, when Scott asked Defendant if he waived his rights, Defendant responded, "Excuse me?" Scott then replied with another compound question: "You waive your rights? Would you like to talk to us?" Defendant responded, "Yes. Yes." Defendant's response to the second compound question is again unclear as to whether he agreed

to waive his rights or wanted to talk to the agents.

The lack of clarity is actually heightened by the subsequent questions and answers. After receiving Defendant's answer of "Yes. Yes," Scott read the waiver language from the waiver form to Defendant. Defendant's response to the actual waiver language on the form was to ask Scott, "How is this going to hurt me?" Therefore, the only two times when Defendant is presented with only questions relating to waiving his rights, as opposed to coupling it with questions about wanting to talk to the agents, Defendant responded with questions. The first time he responded, "Excuse me?" The second time, he responded, "How is this going to hurt me?"

The United States argues that Defendant's question about how waiving his rights could hurt him demonstrates Defendant's understanding of his rights and shows that he was weighing whether to waive those rights. However, the question actually causes the court to question whether Defendant actually understood his rights. If Defendant understood that anything he said in response to Scott's questions could be used against him in court, he would not need to ask how waiving his rights and talking to the agents was going to hurt him.

Instead of answering the question Defendant posed to him–how is this going to hurt me?--Scott responded about how Defendant's waiver of rights and willingness to talk to them could help him. Defendant did not receive an answer to the question "how is this going to hurt me?" The court, therefore, is left to guess as to whether Defendant knew that anything he said to the agents could be used against him in court. If Defendant knew and understood that anything he said could be used against him in court, why would he ask Scott "how is this going to hurt me?"

The fact that Defendant did not get a clear answer to his question troubles the court because Defendant appears to be trying to understand his rights prior to deciding whether to waive those rights. Scott responded by stating that Defendant's answers could "be used in [his] favor," "[w]hen you go to Court . . . so that can be used to help you." The United States argues that Scott's response was technically true, but the court does not entirely agree with that position. It is technically true that Defendant's cooperation and information could help Defendant with the prosecutor. But Scott went a step further and stated that Defendant's answers could be used to help him when he goes to court. Scott's statement, therefore, directly contradicts the explanation of rights that anything Defendant says can be used against him in court.

As stated above, Defendant's question asking how waiving his rights and speaking to Scott could hurt him makes the court question whether Defendant understood that his statements could be used against him in court. When Scott told Defendant that his statements could be used to help him when he goes to court, that misinformation led Defendant to agree to sign the waiver. If Defendant had clearly appeared to understand his rights and had completed the waiver request before he posed his question, the court believes that Scott could have responded the way he did. However, Scott himself had not moved on to any substantive questions at the time. Scott was still asking Defendant to waive his rights and sign the waiver form when he told Defendant his statements could be used to help him in court.

In *United States v. Hernandez*, the Tenth Circuit made a distinction between using threats and promises during the substantive portion of the interview and making the same statements during advisement of *Miranda* rights. 93 F.3d 1493, 1503 (10th Cir. 1996). Although the court

would not characterize Scott's statement that the information Defendant gave could help him in court as a promise, it is similar in nature. It appears to have induced Defendant into signing the waiver form.

"A translation of a suspect's *Miranda* rights need not be perfect if the defendant understands that he or she need not speak to the police, that any statement made may be used against him or her, that he or she has a right to an attorney, and that an attorney will be appointed if he or she cannot afford one." *United States v. Hernandez*, 93 F.3d 1493, 1502 (10th Cir. 1996). "Although there is no mandate that 'magic words' be used, there is a requirement that all elements of *Miranda* be conveyed." *United States v. Tillman*, 963 F.2d 137, 141 (6th Cir. 1992). "Of all of the elements provided for in *Miranda*," the element that any statements made could be used against the person "is perhaps the most critical because it lies at the heart of the need to protect a citizen's Fifth Amendment rights." *Id.* "By omitting this essential element from the *Miranda* warnings a person may not realize why the right to remain silent is so critical." *Id.* In this case, Scott initially told Defendant that anything he said could be used against him, but when Defendant asked Scott how waiving his rights could hurt him, Scott failed to ensure that Defendant understood this element and how it was linked to his right to remain silent. "Although we as judges and lawyers may be aware of the link between these elements, we can not be so presumptuous as to think that it would be common knowledge to laymen." *Id.*

The court is required to determine whether Defendant understood his rights and knowingly waived those rights based on a totality of circumstances. In this case, the court cannot conclude that the government has met its burden in demonstrating that the totality of the

circumstances demonstrates that Defendant understood the nature of his rights and the consequences of the decision to abandon that right.  This case presents the court with a situation where someone who has been in the country for only one week is being advised of his rights. The case presents no problem with the Spanish translation of the rights.  But there is a question as to Defendant's ability to understand those rights based on his question to Scott demonstrating that he did not know how waiving his right to remain silent would hurt him.  There is no evidence in the record that Defendant can read and write but he stated that he came to the United States to enroll in school.  The court notes that when Defendant did not know what initials were and Scott told him to write J.R., Defendant wrote A.R.  Not knowing what initials are is a good indication that Defendant was in a different culture that may not have made sense to him.  Defendant had been in the United States for only one week when he was arrested and it is not clear whether he had any prior familiarity with the rights allowed in our legal system.  There is also no evidence that Defendant had ever been involved in any legal proceedings before in Mexico or during his short stint in the United States.  Although Defendant did not ask questions when each right was read to him, he ultimately asked a question directly related to one of the rights.  Given this question and the cultural differences Defendant faced, the court cannot find that Defendant understood each right immediately as it was expressed to him.  Scott gave Defendant better and clearer assistance with Defendant's question about initials than he did on the question relating to the consequences of waiving his rights.

     The United States claims that Defendant's question–how will this hurt me?–demonstrates that Defendant was weighing the pros and cons of waiving his rights.  But Defendant did not ask

how waiving his rights could help or hurt him. He asked only how waiving his rights could hurt him. The obvious answer to the actual question Defendant asked is to refer Defendant back to the statement of rights that anything he says can be used against him in court. Another potentially appropriate response would have been that waiving his rights could both help and hurt him. Scott could have explained that while his statements could be used against him in court, his cooperation could be used in his favor with the prosecutor when he or she is deciding what charges to bring, in negotiating a plea, etc. However, to only state that Defendant's willingness to answer questions would help Defendant with the prosecutor and more specifically in court was misleading and also ignored the possibility that Defendant did not understand that his statements could be used against him. The court does not believe that Scott intentionally tried to mislead Defendant, but the court also does not believe that Scott properly weighed the significance of Defendant's question.

     Even though a signed waiver is not necessary and Defendant could have waived his rights prior to actually signing the waiver form, given the totality of the circumstances in this case, including the question and response that occurred just prior to Defendant signing the waiver form, the court cannot conclude that the government has met its burden of demonstrating that Defendant understood that anything he said to the agents could be used against him in court and that Defendant knew the consequences of abandoning his right to remain silent would be that his statements could be used against him. Therefore, Defendant's *Miranda* waiver was not knowingly made and the court suppresses Defendant's statements to the agents on June 8, 2016, because they were in violation of *Miranda*.

Defendant also argues that his statements should be suppressed because, before the taped interview began, Scott allegedly promised Defendant that if he answered the agents' questions, he could go home. The parties agree that if such a promise had been made before Defendant received his *Miranda* warnings, the subsequent waiver would not be voluntary. However, based on the weight of the evidence before the court, the court does not find it credible that Scott would make such a promise. Scott denies making the promise so his denial and Defendant's allegation essentially cancel each other out. But, the court finds it compelling that Defendant never mentioned the alleged promise during the course of the taped interview. If Scott had made such a promise just prior to the interview, it would seem likely that Defendant would have referred to the promise at some point during the interview. As discussed above, Scott and Defendant discussed how waiving his rights and talking to the agents could help Defendant. When Scott mentioned that providing information to the agents could be given to the prosecutor and help Defendant in court, it would seem likely that Defendant would have mentioned the promise that he could go home in a week. The court would also think that toward the end of the interview, Defendant would have referred to the promise to see if he had given adequate information to be able to go home or made some statement about upholding his end of the promise and ensuring that Scott would uphold the other end of the bargain.

Because there would be such a high risk that a Defendant would refer back to such a promise, the court also finds it unlikely that Scott would have made the promise while he was leading Defendant to a taped interview. Scott would realize that any mention of such a promise would be memorialized on the tape. In addition, several other agents were present for the

interview. Scott testified that he knew such a promise was improper. It would, therefore, seem unlikely that Scott would have risked an improper promise being exposed to his fellow agents, who would have also known that such a promise was improper. The court concludes that the evidence does not support a finding that Scott made Defendant a promise that he could go home if he answered the agents' questions. Therefore, the court finds no *Miranda* violation based on an improper promise prior to Defendant being advised of his rights.

Defendant further asserted that his statements should be suppressed because Defendant was not advised of his right to have the Mexican Consulate notified of his arrest. But an arresting officer's failure to comply with the Vienna Convention's consular-notification provision does not warrant suppression of evidence. *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 350 (2006); *United States v. Minarez-Alvarez*, 264 F.3d 980 (10th Cir. 2001) ("suppression is not an appoprriate remedy for a violation of Article 36 of the Vienna Convention.")

## CONCLUSION

Based on the above reasoning, Defendant's Motion to Suppress is GRANTED. Defendant's custodial statements to agents on June 8, 2016, are suppressed.

DATED this 22d day of December, 2016.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge